# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

                                                                       Case No.: 15-CR-2030 WJ

ROY HEILBRON,

      Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING UNITED STATES' MOTION TO EXCLUDE THE TESTIMONY OF GARRY GORDON, D.O

THIS MATTER comes before the Court upon the United States' Motion for *Daubert* Hearings and to Exclude Evidence (**Doc. 31**) filed on October 11, 2016.  Having considered the parties' written and oral arguments, the testimony and evidence presented at the *Daubert* hearing on December 19, 2016, and the applicable law, the Court finds that the United States' Motion is well-taken and, therefore, is **GRANTED.**

## BACKGROUND

Defendant Roy Heilbron, M.D., is charged with 21 counts of healthcare fraud in violation of 18 U.S.C. § 1347(a)(2) and three counts of wire fraud, in violation of 18 U.S.C. § 1343. During the timeframe pertinent to this case, Defendant, who was a board-certified cardiologist, practiced cardiology and internal medicine.  He operated a medical clinic in Santa Fe, New Mexico and described his approach, as a practicing physician, as "holistic."

The Indictment alleges, in pertinent part, that Defendant committed healthcare fraud by submitting fraudulent claims to Medicare and a number of private healthcare insurers.  The United States alleges these claims were fraudulent because Defendant knew at the time they were

submitted that they falsely stated diagnoses, sought payment for services Defendant knew to be medically unnecessary, and sought payment for services that were not performed.  The Indictment further alleges Defendant submitted claims to the health care insurers for tests with false diagnoses codes to justify the tests.  As part of this scheme, the United States contends that Defendant ordered and performed medically unnecessary tests; inserted false symptoms, observations, and diagnoses into patients' medical charts to provide written support for the tests he ordered or performed; frequently submitted claims for two consecutive dates of service when the patients only visited the office on one date; misused coding modifiers; caused claims to be submitted to health care benefit programs for procedures or treatments that were never performed; placed and caused to be placed in patients' medical charges clinical notes, diagnostic test results, and ultrasound images that were photocopies of other patients' records; used photocopied order sheets that contained pre-filled symptoms or diagnosis codes; and, when the private healthcare plans requested additional documentation in support of submitted claims, submitted notes, reports, images, and order sheets he knew to be false. *See* Doc. 2, at 4–7.  Significantly, of the vast number of medical tests at issue in this case that were billed to Medicare and other private health insurers, most if not all were billed by Defendant as a cardiologist practicing medicine in the specialty of cardiology and internal medicine, and Medicare and the other health insurers paid these claims as they would to a cardiologist or internist treating patients.

Defendant identified two experts[1], John F. Kressler II, M.D., and Garry Gordon, M.D., and provided untimely notice that he may call these experts to testify at trial regarding the medical necessity of diagnoses, treatments, and tests conducted by Defendant regarding the

---

[1] Defendant identified a third expert, Loraine Molinari of Medicare Coding, LLC, to testify about medical billing and coding relevant to this case.  *See* Doc. 29, at 2.  At the hearing, Defense counsel stated Ms. Molinari never generated an expert report, so the Court assumes that Ms. Molinari will not be testifying at trial.

patients evaluated and treated by Defendant. However, at the *Daubert* hearing, Defendant's counsel indicated he was withdrawing Dr. Kressler and stated Dr. Kressler will not testify at trial. Thus, the Court will not address either parties' arguments pertaining to Dr. Kressler's proposed testimony as such arguments are now moot.

> Defendant proposes to call Dr. Gordon to testify as to the following matters:
>
> [T]o provide medical expert opinion and testimony regarding the issues raised in Dr. Shadoff's expert report, including, but not limited to, the appropriateness of Dr. Heilbron's medical treatment of patients; the medical necessity of treatment provided by Dr. Heilbron; the appropriateness of billing procedures utilized by Dr. Heilbron; and will offer specific opinions concerning the diagnosis and treatment of patients referenced in the indictment, utilizing principles of holistic medicine.

Dr. Gordon identifies himself as a practitioner of "holistic integrative medicine." He received his Doctor of Osteopathy in 1958 from the Chicago College of Osteopathy in Illinois. He received his honorary medical degree from the University of California Irvine in 1962.[2] Dr. Gordon describes his medical approach as integrating alternative treatments including acupuncture, herbs and supplements. He incorporates traditional or conventional medicine with newer, alternative therapies. Dr. Gordon presently treats patients, but he does not bill his services to healthcare insurers.[3] He explains that insurers do not reimburse for his services, so he runs a completely "cash" practice. He identifies his specialty areas as orthomolecular nutrition**,** heavy metal toxicity, medical director for a medical lab measuring metals and toxic metals, and chelation therapy to remove mercury and other metals from the blood.[4] Important to the Court's

---

[2] Dr. Gordon is no longer a licensed Medical Doctor or Doctor of Osteopathy because he chose not to renew those licenses. As of the date of the *Daubert* hearing, Dr. Gordon is licensed only in Homeopathic Medicine in the state of Arizona, where he currently treats patients. Arizona is one of two states that licenses practitioners in Homeopathic Medicine.

[3] Although Dr. Gordon testified at the hearing that he presently treats patients, his CV indicates he has not practiced medicine in approximately 25 years.

[4] Dr. Gordon's CV indicates he operates the Gordon Research Institute, an entity that focused on holistic medicine and chelation therapy that provided lecturing and training on these topics. Interestingly, Dr. Gordon testified at the

3

ruling, Dr. Gordon has no training or experience as a cardiologist, and has never practiced cardiology.

Dr. Gordon reviewed the medical charts of nine of Defendant's patients referenced in the Indictment.[5]  Dr. Gordon opines that each patient was unwell, had extensive medical complaints, and sought holistic care after little success from conventional practitioners.  Dr. Gordon believes that each test Defendant ordered was medically necessary from a holistic practitioner's standpoint.  More specifically, Dr. Gordon explains it is a holistic practitioner's duty to perform a variety of tests on a patient regardless of whether Medicare or private health insurance will pay for those tests.

The United States filed a Motion for Pretrial *Daubert* Hearing and to Exclude Evidence on October 11, 2016 (**Doc. 31**) in which it moves to exclude the report, testimony, and opinions of Defendant's experts under Federal Rules of Evidence 104(a), 702, 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  Defendant filed a Response on November 1, 2016 (**Doc. 33**).  The United States filed a Reply on November 28, 2016 (**Doc. 43**).  The Court held a *Daubert* hearing on December 19, 2016.

## LEGAL STANDARD

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993), the Supreme Court of the United States explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant. *See Dodge v. Cotter Corp*., 328 F.3d 1212, 1221 (10th Cir. 2003) (trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).  The

---

hearing that the Institute stopped operating about 10 years ago; however, his expert report is drafted on Gordon Research Institute letterhead.  *See* Doc. 35-1.

[5] Of the nine patients of Defendant referenced in the Indictment and in Dr. Gordon's report, one (Patient H) was an undercover FBI agent.

gate-keeping function involves a two-step analysis. First, the Court must determine whether the expert is qualified by knowledge, skill, experience, training or education to render an opinion. See Fed. R. Evid. 702. Second, if the witness is so qualified, the Court must determine whether the expert's opinions are reliable under the principles set forth under *Daubert*, 509 U.S. 579, and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *see Ralston v. Smith & Nephew Richards, Inc*. 275 F.3d 965 (10th Cir. 2001).

To assist in the assessment of reliability, the Supreme Court in *Daubert* listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. 509 U.S. at 593-94. As noted, the list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *Kumho Tire*, 526 U.S. at 150, *Dodge*, 328 F.2d at 1222.

Under *Kumho Tire*, a reliability finding is a prerequisite for *all* expert testimony in areas beyond the knowledge and experience of lay jurors, not just technical or scientific evidence. In *Kumho Tire*, the United States Supreme Court emphasized that *Daubert* factors are not a definitive checklist or test and that a court's inquiry into reliability must be tied to the facts of a particular case. *Id.* at 150. Also, under *Kumho Tire*, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. *Id.* at 152.

"[A] district court has discretion to limit the information upon which it will decide the *Daubert* issue...." *Dodge*, 328 F.3d at 1228; *see Goebel*, 346 F.3d at 990 (recognizing the district

courts' broad discretion in deciding how to assess an expert's reliability). "It is plain that a district court exercises significant discretion in deciding how to perform its gatekeeper role." *Dodge*, 328 F.3d at 1228.

## DISCUSSION

### I. Qualifications

The United States challenges Dr. Gordon's qualifications to offer expert testimony in this case. The Government points out that this case turns on the medical evaluations, diagnoses, treatments, and billing practices of Defendant, a physician specializing in cardiology and internal medicine, and whether the diagnoses and treatments reflected on his health insurance claims forms were medical necessary. Dr. Gordon, however, does not claim to practice, and never practiced, cardiology, internal medicine, holistic cardiology, or holistic internal medicine. Rather, Dr. Gordon claims to be an expert in the area of "holistic integrative medicine." The United States argues such expertise does not qualify Dr. Gordon to testify about the medical necessity of medical evaluations, diagnoses, and treatments engaged in by a physician specializing in cardiology and internal medicine, even a physician who practices holistic cardiology or holistic internal medicine. *See*, *e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue").

In response, Defendant argues Dr. Gordon is qualified to testify because he practices holistic medicine, which is a separate specialty employing medical procedures not necessarily utilized in cardiology or internal medicine. Defendant states that Dr. Gordon opined that the tests Defendant ordered were medically necessary pursuant to holistic standards. Defendant argues Dr. Gordon's opinions support the testing ordered by Defendant essentially because the

6

"traditional approach" used by conventional doctors uses a different set of tests to evaluate diseases.

The United States replies that Dr. Gordon is not a cardiologist, holistic or otherwise. He never received training as a cardiologist, was never credentialed as a cardiologist, and never practiced as a cardiologist. According to his CV, Dr. Gordon has not practiced medicine since 1991, but rather has devoted the last 25 years to formulating and marketing specialized vitamin, mineral, and herbal products for both professional and lay markets and developing and organizing effective medical related conferences for health professionals and lay background. He identifies no case in which he has served as an expert witness and, with the possible exception of his advocacy of supposed anti-aging remedies, no peer-reviewed scientific journal in which he recently has presented any research of a scientific nature.

At the hearing, the Government pointed out that Dr. Gordon has no experience with New Mexico's Local Coverage Determinations ("LCD"), which are determinations established by healthcare insurers that set criteria for using medical procedures such as whether certain procedures are reasonable. Moreover, the Government highlighted that Dr. Gordon has no experience using several of the tests that Defendant used on patients, namely echocardiograms, which use ultrasound to produce either 2 or 3-dimensional displays of the heart to diagnose or monitor heart conditions. As another example, Dr. Gordon testified that he has performed ultrasounds and electrocardiograms, which are other tests Defendant utilized, but the last time he performed these tests was approximately eight years ago.

The Court agrees with the United States. Even if Dr. Gordon is qualified to offer opinion testimony on holistic medical practices and testing procedures, nothing in his background reveals experience of any kind in cardiology and internal medicine. This case is about cardiology, not

7

"holistic integrative medicine." The Indictment alleges Defendant billed insurance companies for cardiovascular treatments and tests, not for holistic ones. In fact, the alleged victim healthcare insurers did not pay for holistic claims and did not credential physicians as holistic practitioners. Dr. Gordon himself admits he lacks experience in many of the tests ordered and performed by Defendant, such as the echocardiogram. He agrees he has no familiarity with local LCD or with Medicare billing guidelines. He cannot say whether Medicare deemed certain tests medically necessary, because he admits he has no knowledge of those standards. He admittedly has no experience whatsoever in medical billing of any kind as he runs a practice that does not bill insurers. Put simply, Dr. Gordon's expertise in holistic procedures and his current practice of homeopathic medicine does not qualify him to testify about the medical necessity of medical evaluations, diagnoses, and treatments engaged in by a physician specializing in cardiology and internal medicine, even a physician who practices holistic cardiology or holistic internal medicine. *See Ralston*, 275 F.3d at 970. In *Ralston*, the Tenth Circuit held a board certified orthopedic surgeon was not qualified to opine on a specific subject matter when she testified that she had little knowledge on the subject and did not conduct any research on the topic. *Id.* at 969–70. Similarly here, throughout the *Daubert* hearing Dr. Gordon repeatedly conceded that he has no background or training in cardiology practices or many of the tests used by Defendant. He has absolutely no experience in billing as a credentialed cardiologist. The only reason Defendant advances in support of Dr. Gordon's testimony is that Dr. Gordon is a holistic specialist so he is entitled to testify by relying on general holistic principles and practices. Dr. Gordon offers nothing to establish that holistic medicine has been subjected to testing or peer review; what standards, if any, control operation of holistic medicine; and whether holistic medicine is generally accepted within the relevant professional community. The Court

accordingly concludes Dr. Gordon does not qualify to give expert testimony in this case on the appropriateness of Dr. Heilbron's medical treatment; the medical necessity of treatment provided by Dr. Heilbron; the appropriateness of billing procedures utilized by Dr. Heilbron; and the diagnosis and treatment of patients referenced in the Indictment.

## II. Reliability

The United States challenges the reliability of Dr. Gordon's proposed testimony, arguing Dr. Gordon's report is an incomplete summarization of some of Defendant's patients' medical records with virtually no analysis underlying its opinions. Dr. Gordon invites the jury to rely on prejudice and speculative conspiracies, not scientific proof. The United States further contends Dr. Gordon improperly opines that certain facts are true or false and that Defendant did not commit fraud. Large portions of text seem to be copied from Dr. Kressler's report. The Government states it cannot determine whether statements Dr. Gordon makes in his report are his own, taken from patient records, or taken from Dr. Kressler's report. Dr. Gordon does not state what documents he is quoting from (or whether he is quoting from them at all), and whether the opinions he states are Defendant's, his own, or someone else's, it is difficult to ascertain from his report what, exactly, his opinions are. The United States continues that Dr. Gordon's statements fail to provide any meaningful data, methodology, or analysis necessary to establish the reliability of holistic medicine in general.

Defendant counters that Dr. Gordon's testimony is reliable because he has general experience in holistic medicine, and holistic doctors perform a litany of tests to find the root cause of a medical problem regardless of whether they anticipate payment or reimbursement from an insurer.

The Court concludes Dr. Gordon's proffered testimony is not reliable, and should be excluded. At the hearing, Dr. Gordon testified that it is possible Defendant provided written opinions that Dr. Gordon incorporated into his own expert report. This could explain why certain portions of Dr. Gordon's report are identical to Dr. Kressler's report. Defendant will not be permitted to offer his opinion testimony through Dr. Gordon as the vehicle. Either Defendant may testify or he may not; but he cannot offer his opinions through Dr. Gordon.

Moreover, much of Dr. Gordon's expert report, and much of his testimony at the hearing, focuses on criticizing the Government's expert Dr. Shadoff and conventional medicine in general, rather than opining on matters relevant to this case. For example, Dr. Gordon opines: "The danger for Dr. Heilbron and the out of control Medicare system that is attacking Dr. Heilbron, is that holistic based therapies work and the world is going to recognize that sooner than later!" Doc. 35-1, at 2. And: "Dr. Shadoff type of cardiologist [sic] are too influenced by the high-priced invasive procedures that keep their incomes up and have very little interested [sic] in the convenience and safety of generally pain free 'Alternative' therapies holistic doctors like Dr. Heilbron offer, because they will make far less money." *Id.* Such testimony is not reliable because it has no basis in the relevant medical field. *See Kumho Tire, 526 U.S. at 150, Dodge, 328 F.2d at 1222.*

Dr. Gordon also testified at least once that "there was no fraud" and his expert report contains numerous statements to the same effect.[6] As the United States appropriately notes, expert testimony that invades the province of the jury or renders opinions on issues of law is

---

[6] Dr. Gordon mixes his statements about ultimate issues of law with complaints against traditional medicine: "Now it is apparent that since there was never any fraud in the [sic] Dr. Heilbron's case, that it was drummed up out of thin air, and is meant to scare other doctors into complying with the outdated, incomplete medical care delivery system that Dr. Shadoff wants to defend." And further: "Mainstream doctors, who lack the energy interest to learn new things, are aware of the competition they are starting to face. They want Doctor's [sic] like Dr. Heilbron, to be eliminated even if they have to lie to get rid of them." Doc. 35-1, at 2.

10

improper. *See Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) (explaining that testimony on ultimate issues of law an expert "is inadmissible because it is detrimental to the trial process"). Any statements that usurp the province of the jury are inadmissible. Testimony that Dr. Heilbron did not commit fraud would constitute a legal conclusion on an ultimate issue of law, and the Court agrees with the United States that this type of testimony is improper. *See United States v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005) ("However, an expert may not simply tell the jury what result it should reach without proving any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment.").

Accordingly, the Court concludes Dr. Gordon's proposed expert testimony is not reliable and will be excluded.

### III. Relevance

The United States lastly argues Dr. Gordon's testimony is not relevant because he opines Defendant's services were medically necessary in the context of holistic medicine as opposed to cardiovascular medicine. The Government points out Defendant never submitted health insurance claims forms for services associated with holistic medicine, so Dr. Gordon's proposed testimony is not relevant. The Indictment alleges that Defendant, who specialized in cardiology and internal medicine, submitted claims for services that were not medically necessary, including "screening exams – that is, tests performed for the purpose of detecting hidden disease in individuals who displayed no signs or symptoms." The United States points out there has been no allegation and there is no evidence that Defendant submitted health insurance claims for holistic health care services. Whether services for holistic medical diagnoses and treatments were medically necessary is therefore irrelevant.

Defendant responds that the proposed testimony of Dr. Gordon is relevant because he will testify the tests ordered and performed by Defendant were based upon a holistic approach and were medically necessary as part of a complete workup.  Holistic medicine integrates conventional and alternative therapies so it sometimes involves different treatment plans than conventional medicine would dictate.  Essentially, because Dr. Gordon will testify that all of the tests ordered by Defendant were medically necessary in a holistic approach (regardless of whether the provider expects payment), Dr. Gordon's proposed testimony is critical to defending the allegations in the indictment.

In the Reply, the United States again argues Dr. Gordon's opinions are irrelevant because Defendant did not submit claims for holistic medical services or chelation therapy.  Defendant submitted claims for services related to the specialties for which he was credentialed and contracted, namely cardiology and internal medicine, and not for any of the types of holistic medicine services discussed by Dr. Gordon.  At the hearing, the United States emphasized such testimony will likely confuse the jury because he should be held to the standard of a billing cardiologist, not a holistic practitioner.  Thus any testimony about what a holistic practitioner would do in contrast to a cardiologist tends to mislead the jury.

The Court agrees with the United States that Dr. Gordon's testimony is not relevant.  The Court's primary concern with Dr. Gordon's testimony is that it will significantly confuse the jury.  Expert opinions must "assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (internal quotations omitted); see also *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (quoting Fed. R. Evid. 702) (explaining that expert testimony must be helpful to the jury).

The helpfulness requirement is closely tied to the requirement that expert testimony be "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

Even if Dr. Gordon is qualified to render some opinions in this case as to holistic medicine, his blanket opinion that all tests ordered by Defendant were medically necessary goes well-beyond the scope of his expertise and is thus improper. Even in the areas in which Dr. Gordon has some expertise, such as general holistic practices and chelation therapy, the way in which Defendant proposes to offer Dr. Gordon's testimony will significantly confuse the jury. As the United States appropriately argues, Defendant was a cardiologist and held himself out to Medicare and the private healthcare insurers as a cardiologist. The insurers credentialed Defendant as a cardiologist, and he was contracted to provide specialized cardiology services. Although Defendant described his approach as holistic, he was *not* credentialed as a holistic physician, and he did not submit claims to the insurers for holistic procedures. Indeed, the insurers would not pay claims for holistic procedures. Even if Dr. Gordon is an expert in holistic medicine, it does not render him qualified to give opinions in this case when Defendant was billing insurance companies for cardiovascular treatments and tests, not for holistic ones. In fact, the alleged victim healthcare insurers did not pay for holistic claims and did not credential physicians as holistic practitioners. Therefore, what a holistic practitioner would or would not do with regards to billing is simply irrelevant and would significantly confuse the jury.

Over and over again, Dr. Gordon emphasizes the ways in which holistic medicine differs from traditional cardiology. He stresses that holistic medicine catches many life-threatening diseases that traditional medicine overlooks. The gist of his opinion appears to be that Defendant's billing practices were proper because he billed for tests regardless of whether he expected payment for those tests. But Defendant did not perform nor make insurance claims for

13

the holistic procedures Dr. Gordon references, and Dr. Gordon is only qualified, if at all, to offer testimony on holistic medicine.  Defendant identified himself to and sought credentialing from the health plans as a physician specializing in cardiology and internal medicine, *not* as a holistic medical practitioner. Defendant entered into contracts with health plans to provide medical services in the specialty areas of cardiology and/or internal medicine. Defendant was *not* credentialed by any of the health plans as a practitioner or specialist in holistic medicine nor in holistic cardiology nor in chelation therapy.  Under Rule 702(a), expert testimony may be admissible if it "will help the trier of fact to understand the evidence or determine a fact in issue."  Whether the services for which Defendant submitted claims were medically necessary in the context of holistic medical services or chelation therapy is irrelevant, because Defendant did not submit—and could not submit—claims for holistic medical services or chelation therapy.

At the hearing, the Government illustrated how Dr. Gordon's testimony would likely confuse the jury.  Counsel for the Government stated it will present evidence showing Defendant performed 90 hours of medical tests in only 2 to 3 hours, which would be impossible.  Moreover, Defendant performed 3-D echocardiograms after performing a 2-D echocardiogram on every single patient, when a cardiologist would never perform a 3-D test unless the 2-D test revealed a problem warranting further exploration.  A 3-D echocardiogram is predominantly utilized as a pre-operative procedure.  Dr. Gordon could not possibly offer relevant testimony in this regard, because as he admits, he has never performed an echocardiogram, 2-D or otherwise.  Dr. Gordon may have ample knowledge in chelation and metal toxicity, but those treatments are not at issue here.  Thus, Dr. Gordon's testimony is irrelevant and confusing.

The Court offers another example of how confusing to the jury Dr. Gordon's testimony would be.  During cross examination of Dr. Gordon, counsel for the United States focused on

Patient A, who is one of the nine patients referenced in the Indictment. During Dr. Gordon's direct testimony, he testified that he reviewed in detail Defendant's patient records for the nine patients including Patient A. Dr. Gordon testified that as to Patient A (and the other eight patients), all tests performed by Defendant were medically necessary. On cross examination, Dr. Gordon was asked how many tests for Patient A were reflected in Defendant's patient records for Patient A. Dr. Gordon answered that the Defendant's patient records revealed nine tests. Dr. Gordon was then shown a Government exhibit that purports to show that there were forty-six tests billed by Defendant for Patient A for a two to three hour time span. Dr. Gordon had never seen the Government's exhibit but then offered testimony to the effect that in order to get reimbursed by Medicare, tests have to be coded and listed multiple times and this accounts for the discrepancy in the differing number of tests performed on Patient A. Dr. Gordon as a former practicing D.O. may be qualified to opine about the medical necessity of some of the tests performed on Patient A, but clearly he is not qualified to opine about the medical necessity of testing procedures unique to the practice of cardiology. Additionally, Dr. Gordon is not qualified to testify about Medicare or other health insurer providers billing or coding requirements and his testimony about testing procedures having to be coded and listed multiple times on a document he's never seen before is nothing more than rank speculation. This is a point that Dr. Gordon concedes. The Court's gatekeeping function for expert testimony also extends to excluding proposed expert testimony that is so confusing that it would mislead a jury. Stated another way, Dr. Gordon's proposed expert testimony would not be helpful to the jury. *See* Fed. R. Evid. 702(a) (expert testimony must "help the trier of fact").

In sum, the Court finds and concludes that Dr. Gordon's testimony as a licensed practitioner of homeopathic medicine does not meet the requirements under *Daubert*. Dr.

Gordon's knowledge, skill, experience, training and education do not satisfy *Daubert*'s qualification requirements.  Also, in considering the facts of this particular case, the Court finds Dr. Gordon's testimony is not reliable under the standard set out in *Daubert*.  Finally, the Court finds Dr. Gordon's testimony will not be helpful in assisting the jury in deciding the ultimate factual and legal issues in this case and will instead cause confusion.

**THEREFORE,**

**IT IS ORDERED** the United States Motion to Exclude Evidence (**Doc. 31**) is hereby **GRANTED** for the reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE